**Rodrigo PARTIDA**

v.

**Claudio CASTANEDA, Sheriff.**

**Civ. A. No. 74–B–50.**

United States District Court,
S. D. Texas,
Brownsville Division.

Oct. 26, 1974.

ACLU Foundation–South Texas Project, David G. Hall, San Juan, Tex., for petitioner.

Oscar McInnis, Crim. Dist. Atty. of Hidalgo County, Edinburg, Tex., for respondent.

## MEMORANDUM

GARZA, District Judge.

After exhausting all available state remedies, the Petitioner, Rodrigo Partida, filed this Petition for Writ of Habeas Corpus with the United States District Court, Southern District of Texas, naming Claudio Castaneda, the Sheriff of Hidalgo County, Texas, as Respondent. Petitioner alleges he has been denied due process and equal protection of the laws under the Fourteenth Amendment to the Constitution, because Mexican-Americans were significantly underrepresented on the state grand jury that indicted him, as a result of a long continued system of underrepresentation in the particular jurisdiction where he was tried. The District Attorney for Hidalgo County filed the answer for the Respondent which asserts that the Petitioner has waived his right to claim racial discrimination because Petitioner failed to raise his claim prior to trial. It is further asserted that the Texas Court of Criminal Appeals was correct in holding Petitioner failed to establish his claim that he had been denied his constitutional rights because of a long continued racial underrepresentation on the state grand juries in Hidalgo County. Two issues are presented for decision by this Court. The first issue is whether this Court should hold Petitioner waived his right to object to the composition of the grand jury that indicted him, where the state courts have ignored any waiver provision and considered Petitioner's claim on the merits. The second issue is whether the Petitioner has proven his claim of a long-continued racial underrepresentation in the particular jurisdiction where he was tried and is entitled to relief.

The Petitioner, Rodrigo Partida, was indicted on March 17, 1972, for the offense of burglary of a private residence at night with intent to commit rape; on December 19, 1972, the Petitioner was found guilty by a jury and sentenced to serve not less than five nor more than eight years in the Texas Department of Corrections. The Petitioner filed a Motion for a New Trial and for the first time raised the issue of the unconstitutional composition of the grand jury that indicted him. Petitioner attempted to prove systematic racial discrimination in the selection of the grand jurors in Hidalgo County by placing in evidence data from the U.S. Census of 1970, which shows that the Mexican-American population of Hidalgo County, as indicated by Mexican-American surnames, was 79.2% of the total population. He further showed that the grand juries for the ten year period from 1962 to 1972, when he was indicted, were composed of 39% Mexican-American surnamed jurors. These figures illustrate the existence of a 40.2% disparity between the percentage Petitioner's ethnic group constituted of the total population, and the percentage which his ethnic group constituted of the jury lists actually compiled. Petitioner's Motion for New Trial was overruled and he appealed to the Texas Court of Criminal Appeals, the highest state appellate court on criminal matters. The Texas Court of Criminal Appeals considered the untimely presented point of error and held that the Petitioner had failed to carry his burden of establishing a *prima facie* case of jury discrimination and, therefore, affirmed his conviction. Partida v. State of Texas, 506 S.W.2d 209 (Tex. Cr.App.1974). The Texas Court of Criminal Appeals held that even though Petitioner did show a substantial underrepresentation of Mexican-Americans on the grand jury, he failed to show:

> ". . . that the females who served on grand juries were not of Mexican-American descent but married to husbands with Anglo-American surnames. He did not show how many persons with Mexican-American surnames or of Mexican-American descent were summoned for grand jury duty and were excused for age, health or other legal reasons. . . . How many of those listed in the census figures with Mexican-American names were not citizens of the state, but

were so-called 'wet-backs' from the south side of the Rio Grande; how many were migrant workers and not residents of Hidalgo County; how many were illiterate and could not read and write; how many were not of sound mind and good moral character; how many had been convicted of a felony or were under indictment or legal accusation for theft or a felony; none of these facts appear in the record. Their absence renders the disparity of the percentages of little force or effect."

As further evidence of the lack of purposeful discrimination, the Texas Court of Criminal Appeals noted that the record showed that the Judge who presided at the trial and summoned the jury commissioners had a Mexican-American surname; that three of the five jury commissioners that he summoned had Mexican-American surnames; that ten of the twenty members of the grand jury array had Mexican-American surnames; that five of the twelve grand jurors that indicted Petitioner had Mexican-American surnames, probably because four of the original members of the array who were Mexican-Americans could not be located; that the foreman who signed the grand jury indictment had a Mexican-American surname; that seven of the twelve petit jurors that found Petitioner guilty had Mexican-American surnames.

After Petitioner's appeal had been denied, he filed his Petition for Writ of Habeas Corpus in this Court. Petitioner alleges he has been denied due process of law and equal protection of the law under the Fourteenth Amendment to the Constitution, because of the ethnic underrepresentation in the state grand jury which indicted him, which defect constitutes a denial of a fundamental right and may be raised for the first time in a Motion for New Trial; that he did not knowingly and intentionally waive his right to challenge the composition of the grand jury because his court appointed counsel did not inform him that such right existed; that he was an indigent at the time of his indictment and was unrepresented by counsel at this "critical stage", which, according to the Texas statutory and court fashioned rules, is the stage when Petitioner must challenge the array or be barred from asserting his challenge; that the Texas statutes do not provide for his particular constitutional challenge and, therefore, he could not have waived it, since it did not exist; that the highest state appellate court on criminal matters considered the constitutional challenge and, therefore, ignored the waiver provisions, if any existed; that the highest criminal appellate court in the state applied the wrong burden of proof and completely misunderstood the requisites of a constitutional attack based on ethnic discrimination in the selection of the grand jury. The state answers that the Petitioner did waive his challenge to the ethnic composition of the grand jury and he did not establish a *prima facie* case of discrimination.

■■ Since the waiver issue is potentially dispositive of the entire case, it will be considered first. Rule 12(b)(2) of the Federal Rules of Criminal Procedure provides:

". . . objections based on defects in the institution of the prosecution or in the indictment . . . may be raised *only by* motion *before trial* . . . failure . . . constitutes a waiver . . . but the court for cause shown may grant relief from the waiver." (Emphasis supplied.)

In Davis v. United States, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973), this rule was held to apply to both procedural and constitutional defects in the institution of prosecutions which do not affect the Court's jurisdiction. The policy reasons for the rule, as so clearly stated by the *Davis* Court, are:

"If its time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses and the parties have gone to the burden and

expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult."

*Davis* clearly establishes the rule that once an objection to the institution of the prosecution is waived, it cannot later be resurrected, either in direct criminal proceedings or in federal habeas corpus, unless cause is shown. If cause is shown, then a new trial will be granted so that an indictment can be returned by a properly constituted grand jury. Nothing in the previous trial need be redone; the prosecution will be allowed to present its entire case through the testimony given at the previous trial, if it is shown that its witnesses are unavailable. Under this procedure, the state will only lose the enhancement of credibility that the actual presence of witnesses will lend to their testimony. Several factors should be considered in determining whether there is sufficiant cause to grant relief from any waiver suffered by the complainant.

■ In determining if cause exists, the Court should consider whether the case against the Petitioner is a strong one or weak one, if the case is a weak one, then it is probable a properly composed grand jury would have found that probable cause did not exist and would not have bound the defendant over for trial; whether the facts concerning the selection of the grand jury were notorious and available to the Petitioner in the exercise of due diligence before trial, if the facts were known it increases the likelihood of a tacit but intentional waiver or intentional tactical decision; con-

siderations of credibility require an examination of how much the state will lose because certain key witnesses are no longer available; judicial economy requires examination of the seriousness of clogging dockets by empaneling new grand and petit juries to re-indict and re-try the defendant; whether upsetting prior convictions will effect enhancement laws; whether any actual prejudice resulted to the defendant from the discriminatory selection of the grand jury, for example, were the two white accomplices set free but the black man bound over for trial. Davis v. United States, *supra* (strength of evidence of guilt—facts of selection notorious—loss of credibility on retrial); Newman v. Henderson, 496 F. 2d 896, 898 (CA 5 1974) (actual prejudice). Reliance on pre-*Davis* cases is not "cause" and will not excuse Petitioner from his failure to timely assert his claim in the trial court. Morris v. Sullivan, 497 F.2d 544 (CA 5 1974).

Factually the law announced in *Davis* can be limited to a Motion to Vacate brought pursuant to § 2255, but the Fifth Circuit has chosen not to circumscribe the *Davis* holding and has held that it applies to state prisoners bringing habeas corpus pursuant to § 2254. Hairston v. Cox, 361 F.Supp. 1180 (W. D.Va.1973); Morris v. Sullivan, *supra*; Newman v. Henderson, *supra*; Jones v. Henderson, 494 F.2d 47 (CA 5 1974); Rivera v. Wainwright, 488 F.2d 275 (CA 5 1974); Marlin v. Florida, 489 F.2d 702 (CA 5 1974).

■ Pre-*Davis*, the rule in this Circuit was that a jury discrimination claim barred by a state procedural timeliness rule, like the Texas rule, could be presented for the first time in federal habeas corpus unless the state proved deliberate bypass or knowing waiver. Post-*Davis*, this Circuit has consistently held that the *Davis* rule is applicable to state grand jury claims and it is the responsibility of the petitioner to show facts and circumstances justifying relief from the waiver. Morris v. Sullivan, *supra*. In *Morris*, it was held that a state's court-fashioned procedural waiv-

er rule should be given the same effect as Rule 12(b)(2). In Valadez v. State, 408 S.W.2d 109 (Tex.Cr.App.1966), the Texas Court of Criminal Appeals held that if the defendant did not timely assert his objection to the grand jury, he would be held to have waived his claim. Ever since Hendandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), it has been held that a Texas grand jury can be attacked for purposeful exclusion of Mexican-Americans. The case of Muniz v. Beto, 434 F.2d 697 (CA 5, 1970), cited by Petitioner, can be distinguished because at the time Petitioner was there indicted, *Hernandez* had not been decided and Texas did not recognize this constitutional claim as a ground for challenge. It now seems apparent that under established Texas law, a defendant can object to a grand jury because of purposeful exclusion of Mexican-Americans, and this objection can be waived if the defendant fails to timely assert it. It is now equally clear that the federal courts will give the same effect to the state waiver rule as it will give to Rule 12(b)(2), Fed.R. Crim.P., waiver rule. The standard for the application of this rule was expressed in Rivera v. Wainwright, *supra*:

"If this waiver meets federal constitutional standards then the petitioner would be precluded from asserting his present claim in this federal habeas corpus proceeding."

Similarly, if the state law does not provide for a procedure to give relief from the waiver, the federal courts will engraft a "cause shown" exception on the state rule and make an independent determination of whether such cause exists. Newman v. Henderson, *supra*. The rationale for this holding is evident; a state prisoner should not stand in a better position than a federal prisoner who would be held to have waived his objection under Rule 12(b)(2). Newman v. Henderson, *supra*.

■ This Court, however, does not feel that *Davis* is dispositive of the factual situation present in this case. Here, the highest state court on criminal matters has chosen to ignore its own waiver provisions and consider the merits of Petitioner's constitutional claim. Where the state courts have ignored their own waiver provisions and considered the merits of a constitutional claim, a federal court is not constrained from also considering the merits of the constitutional claim, even though it may have been waived under the federal rules. In this situation it is well settled that the federal courts will also reach the merits in the absence of an intentional waiver or deliberate bypass. Hale v. Henderson, 485 F.2d 266, 269 (CA 6 1973); Coleman v. Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964); Warden v. Hayden, 387 U.S. 294, 297 n. 3, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Irvin v. Dowd, 359 U.S. 394, 406, 79 S. Ct. 825, 3 L.Ed.2d 900 (1959); Brown v. Allen, 344 U.S. 443, 486, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Herndon v. Lowry, 301 U.S. 242, 247, 57 S.Ct. 732, 81 L.Ed. 1066 (1937); Fay v. Nola, 372 U. S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Having held that Petitioner did not waive his right to present his claim of discriminatory jury selection, it is not necessary to determine at what stage the Texas court-made waiver provision is effective or whether any such provision would make that state a "critical stage" at which the defendant must be represented by counsel.

This Court turns next to a consideration of Petitioner's claim that he has been denied equal protection of the laws because of the long-continued systematic underrepresentation of Mexican-Americans on the grand jury panels in Hidalgo County.

■ The standard that has evolved under the due process and equal protection clauses of the Constitution during the ninety years since Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1879), is that an indictment returned against a member of a "distinct group" cannot stand if members of this "distinct group" have been systematically

and intentionally discriminated against in the selection of the grand jury. As eloquently expressed by Chief Justice Warren in Hernandez v. Texas, *supra*:

"Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a *distinct class* is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a 'two-class theory'—that is, based upon differences between 'white' and 'Negro'." (Emphasis supplied.)

A conviction based upon such a constitutionally defective indictment will also be set aside regardless of strong evidence of guilt or lack of objection to the composition of the petit jury that finds the defendant guilty. Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); Labat v. Bennett, 365 F. 2d 698 (5 Cir. 1966). This does not mean, however, that the accused will be set free, since the state may choose to re-indict and re-try him after the constitutional error has been corrected. Hill v. Texas, *supra*; Patton v. Mississippi, 332 U.S. 463, 469, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Swain v. Alabama, 380 U.S. 202, 247, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

■ The person claiming the systematic and intentional discrimination in the selection of the grand jury has the burden of providing a *prima facie* case, but once it is proven, the burden shifts to the state and it will be held responsible for any factual vacuum. Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1224 (1953). Patton v. Mississippi, *supra*; Muniz v. Beto, *supra*. The reason for this rule is:

"It is designed to operate in jury cases so that once the defendant has made a showing of total exclusion, the burden of going forward with the evidence is placed upon the State, the party in the better position to develop the facts as to how the exclusion came about. The defendant is a party to one proceeding only, and his access to relevant evidence is obviously limited. The State is a party to all criminal cases and has greater access to the evidence, if any, which would tend to negative the State's involvement in discriminatory jury selection." Swain v. Alabama, *supra*, at 240, 85 S.Ct. at 846.

"Had there been evidence obtainable to contradict and disprove the testimony offered by petitioner, it cannot be assumed that the State would have refrained from introducing it." Pierre v. Louisiana, *supra*, at 362, 59 S.Ct. at 540.

■ To establish a *prima facie* case of invidious discrimination, the Petitioner must first show a discriminatory result by proving a marked disparity between the percentage which the "district group" constitutes among the potentially eligible jurors and the percentage which the "distinct group" constitutes among the jury list actually compiled by the jury commissioners. Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Muniz v. Beto, *supra*; Singleton v. Estelle, 492 F.2d 671, 677 (1974); Gibson v. Blair, 467 F.2d 842, 844 (1972).

After proving a discriminatory result, the Petitioner must further prove this result was accompanied by some particular discriminatory act or failure to act; or accompanied by token inclusion or total exclusion; or accompanied by a jury selection system containing a significant danger of abuse; or by proving that the discriminatory result was representative of the results obtained in a history of cases in the particular jurisdiction in which the trial occurred, this being strong circumstantial evidence of discriminatory jury selection. Singleton v. Estelle, *supra*; Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 85 L.Ed. 84 (1940) (failure to act—conscious ignorance); Hill v. Texas, *supra* (failure to act—conscious ignorance); Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (racial designation on questionnaire—significant danger of abuse); Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (racial designation on jury cards —significant danger of abuse); Whitus v. Georgia, *supra* (racial designation on tax list—significant danger of abuse); Norris v. Alabama, *supra*, (total exclusion of Negroes from grand juries and petit juries); Brown v. Allen, *supra* (token inclusion of Negroes on grand and petit juries); Patton v. Mississippi, *supra* (history of discriminatory results); Muniz v. Beto, *supra* (history of discriminatory results); Gibson v. Blair, *supra* (history of discriminatory results).

The "Rule of Exclusion" is an evidentiary rule to facilitate the Petitioner in establishing his *prima facie* case of intentional discrimination where evidence of intent is otherwise wanting. Brooks v. Beto, 366 F.2d 1 (CA 5 1966). Under this rule a *prima facie* case can be established, as done in the case before the Court, by showing a long-continued and unexplained disparity.

A disparity great enough to establish a *prima facie* case of discriminatory jury selection will depend on the facts of each case, but an examination of a few recent cases will give an indication of the outer perimeters. In Black v. Curb, 464 F.2d 165 (CA 5 1972), 69% of the total population was Negro, 60% were potentially eligible, yet only 35% of the potential jurors on the jury list were Negro, causing a 25% disparity. The Court indicated this discriminatory result flowed from the fact that the jury commissioners disqualified large numbers of Negroes because they were unknown to the jury commissioners. Failure of jury commissioners to inform themselves of the qualifications of members of minority groups has long been held to be a form of discriminatory jury selection. It should be noted that Negroes constituted a majority of the population, but they were not a *governing* majority even though there was significant inclusion on both grand and petit juries. In Turner v. Fouche, 396 U.S. 346, 359, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), 60% of the total population was Negro, yet only 37% of the jurors on the jury list were Negro, causing a 23% disparity. The Court indicated that this discriminatory result flowed from the fact that the jury commissioners purged a great number of Negroes from the voter lists because they "lacked intelligence" or "uprightness" and were, therefore, disqualified. While Negroes again constituted a majority, they were not a *governing* majority and were significantly underrepresented in all the government of the county. In Pullum v. Greene, 396 F.2d 251 (CA 5 1968), 55.-5% of the total population was Negro, yet only 17.9% of the jury list were Negro, causing a 37.6% disparity. The Court indicated that this discriminatory result flowed from the fact that the selection system contained an inherent danger of abuse, since the jury lists were drawn from segregated tax lists and there was evidence that the jury commissioners failed to familiarize themselves with the community, especially with the previously excluded minority group. In this county in Georgia, there was a long history of total exclusion of Negroes from the jury lists and they clearly were a *non-governing* ma-

jority. Salary v. Wilson, 415 F.2d 467 (CA 5 1969), is another case cited by Petitioner where Negroes were a majority of the population. There, Negroes constituted 55% of the total population, yet only 12.9% of the jurors on the jury list were Negro. The Court indicated that this discriminatory result flowed from the fact the jury commissioners failed to familiarize themselves with the Negro population, which again was a *non-governing* majority. Even though Negroes constituted a majority of the population and were significantly included in the grand jury lists, they were still underrepresented on the grand jury list, and it was held they had established their *prima facie* case. In all of these cases, the excluded group was not a *governing* majority, and the Court found some evidence that discrimination had occurred besides circumstantially through evidence of a long continued disparity. The Court found either total exclusion, token inclusion, some discriminatory act, failure of jury commissioners to inform themselves of qualified members of the community, or found some defect in the selection system. In Swain v. Alabama, *supra*, 26% of the potentially eligible population was Negro, yet only 10%–15% of the jurors on the jury list were Negroes. The Court held:

> "We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. (Citations omitted.) Here the commissioners denied that racial considerations entered into their selections of either their contacts in the community or the names of prospective jurors. There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community. Nor was there any meaningful attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the commissioners. It is not clear from the record that the commission-

ers even knew how many Negroes were in their respective areas, or on the jury roll or on the venires drawn from the jury box. The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes. Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race. We do not think that the burden of proof was carried by petitioner in this case."

In Cassell v. Texas, 339 U.S. 282, 70 S. Ct. 629, 94 L.Ed. 839 (1950), 15.5% of the total population was Negro, yet only 6.7% of the jurors on the jury list were Negro. The Court said this disproportion was not enough to establish a *prima facie* case, since it appeared from the record that not all Negroes in the county were eligible. When this disproportion was considered with the evidence of the failure of the jury commissioners to familiarize themselves with qualified members of the excluded group, it was held sufficient to establish a *prima facie* case.

These cases are illustrative because they show that the percentage disparity required to establish a *prima facie* case will vary according to a great number of factors. For example, a greater percentage of disproportion is permissible when Petitioner bases his disproportion on total population instead of eligible population. The reason is that it will be presumed that a substantial number of the distinct group are eligible, but it will not be presumed that all members of the group are eligible. It would seem that a greater percentage of deviation is permitted where there is no evidence of a discriminatory act or failure to act, token inclusion, total exclusion, inherently dangerous jury selection system, or a long history of discriminatory results. The reason this should be is that the Court must pre-

sume that some defect in the system caused the discriminatory result, but where a defect is shown, then it is only necessary to presume the "nexus" between the defect and the discriminatory result. The amount of inclusion is also to be considered, as well as whether the selection process used reflected a studied attempt at discrimination or was merely haphazard or inadvertent in its failure to ensure all groups in the community were fully represented and also whether the group excluded was a majority or *governing* majority. In determining whether a *prima facie* case of discriminatory jury selection has been established, the Court must examine the entire record and take into account all possible explanations. As clearly stated in Alexander v. Louisiana, *supra*:

> "This Court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account *all possible explanatory factors*." (Emphasis supplied.)

 This Court is aware that the state has the burden of rebutting the Petitioner's *prima facie* case once it has been established, but bias and prejudice are not easily inferred and he must present clear evidence of discriminatory jury selection. Mere allegations alone are not enough. The Court cannot presume a case without some evidence that it, in fact, exists; therefore, the *prima facie* case must depend on the basic correctness of the percentages aided by certain allowable presumptions; the Court is not bound by percentages which are on their face incorrect. The state appellate court incorrectly placed the burden of proof on the Petitioner, but the basic accuracy of his percentages must be considered before this Court can determine if his *prima facie* case has been rebutted by the evidence that the state has presented. The Petitioner's disproportion in the present case is not as great as it seemed at first blush.

He has compared the jury lists with the total population instead of with jury eligibles which inflates the disproportion. While it can be presumed that a substantial portion of the total Mexican-American population is eligible, it must be remembered that this area is unique in that it has a larger ineligible migrant and illegal alien population than other areas. From Petitioner's own evidence, it appears that the percentage of drop-outs before the fifth grade is greater among the Hidalgo County Mexican-American population than is the state-wide percentage among the Mexican-American population. This further indicates that the percentage variation between jury eligibles and total population may be greater in Hidalgo County area than in other areas of the state, because Hidalgo County would have a larger percentage of illiterates. Hunt v. United States, 400 F.2d 306 (CA 5 1968); United States v. Hyde, 448 F.2d 815 (CA 5 1971).

It is clear that in a rapidly changing area a disproportion can be inflated by including too many prior years when representation was even more disparate. The evidence shows that the disproportion was on the decrease in the two years prior to Petitioner's indictment, and the grand jury array was composed of about 45.5% Mexican-Americans, reducing the disparity to 33.7% instead of the alleged 39% disparity. Due to the rapid growth in this area, a percentage comparison should not be carried back too many years, because it will distort the disproportion.

 It is true that some disproportion exists, but the Fifth Circuit recently reaffirmed the doctrine that the Constitution only requires a jury represent a fair cross section of the community; it does not require that the jury mirror the percentage composition of the community. Grech v. Wainwright, 492 F.2d 747 (CA 5 1974). This Court must, therefore, determine whether the disproportion is marked enough to *indicate* that discrimination has occurred. As aptly stated in Akins v. Texas, 325 U.S.

398 at 403, 65 S.Ct. 1276 at 1279, 89 L. Ed. 1692 (1945):

"Our directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the theory that their continual exclusion *indicated* discrimination and not on the theory that racial groups must be recognized." (Emphasis supplied.)

■ The Fifth Circuit has held that when the subjective element enters into the selection process, the percentage variation allowable in *Swain, supra*, could be disregarded and an even narrower range might be required. Thompson v. Sheppard, 490 F.2d 830 (CA 5 1974). Three out of five jury commissioners in the present case were Mexican-Americans, and the Texas system allows the subjective element to enter into its jury selection process; therefore, it would seem that a broader range of variation should be allowed where the "distinct group" allegedly underrepresented is Mexican-American. If people in charge can choose whom they want, it is unlikely they will discriminate against themselves. A broader range of variation should be tolerated here, because the Texas selection system allows the *governing* majority to favor their group when selecting grand jurors.

■ Following the traditional guidelines set out by the courts for proving racial discrimination in the selection of the grand jury, the Petitioner has established a *bare prima facie* case by proving a long continued disproportion in the composition of the grand juries in Hidalgo County, but this Court holds that it has been rebutted.

■ The Petitioner's percentages appear somewhat inaccurate and the circumstantial evidence of lack of discriminatory intent is strong, yet this Court is asked to presume that the judge and jury commissioners intentionally discriminated against Mexican-Americans in their selection for the grand jury. The Petitioner did show a long contin-

ued history of an alleged disproportion, but there is no evidence of tokenism, total exclusion, discriminatory acts or failure to act or of an inherently dangerous selection system. It cannot be argued that the jury commissioners failed to inform themselves of the qualification of Mexican-Americans, because the three Mexican-American commissioners were aware of the qualification of the members of the Mexican-American community; indeed, the other members of the commission also must know these qualifications since they live and work in a community which is almost 80% Mexican-American. It cannot be argued that the judge who selected the commissioners discriminated in his selection. The judge who selected the jury commissioners is a Mexican-American, and he testified he based his selection primarily on geographic considerations, trying to select one commissioner from each precinct in Hidalgo County. While it is clearly established law that the uncorroborated testimony of the judge or the jury commissioners as to their good intentions will not alone rebut a *prima facie* case, it is some evidence of lack of discriminatory intent. It is possible that the judge chose his commissioners from among the outstanding members of the community and that they then chose members of the array from people they knew who were probably on the same socio-economic level. Petitioner's evidence shows that Mexican-Americans are underrepresented at the higher socio-economic level, and this social anomaly could result in an inadvertent disproportion in the grand jury. The jury commissioners, however, chose from the higher socio-economic level because of the natural tendency to prefer their friends and business associates, not because they were unaware of the racial composition of the community, and this is not an act of intentional discrimination.

The Court must also consider the demographic composition of the community. Percentages not tolerated in a more rarified atmosphere may be acceptable

in other areas. The demographic composition of the community involved in the present case is markedly different from that usually considered; therefore, those cases on which Petitioner relies are factually distinguishable from the present case.

Generally the "distinct group" excluded in the cited cases was not a *governing* majority as it is here. Here, 80% of the population is Mexican-American, the majority of the voting population is Mexican-American, the majority of the elected officials are Mexican-American, the majority of the judges and jury commissioners are also Mexican-American, and Mexican-Americans in significant percentages have served on every grand jury in the last ten years. At the time of Petitioner's indictment, there were three district courts in Hidalgo County, and two of these had Mexican-American judges. The record in the present case reveals that the judge that appointed the jury commissioners is a Mexican-American, that 60% of the jury commissioners he appointed in the last two years are Mexican-Americans, that 45% of the grand jurors summoned by these commissioners are Mexican-Americans, that 50% of the jurors summoned to serve on the array were Mexican-American, and the foreman that signed the indictment that indicted the Petitioner was a Mexican-American. Since four Mexican-American members of the jury panel could not be served and one that had been served was absent, only 40% of the grand jury that indicted the Petitioner were Mexican-Americans, but this Court refuses to believe that Claudio Castaneda, the elected Mexican-American sheriff of a county where the majority of the voters are Mexican-American, would purposefully refuse to serve four of the Mexican-American members of the jury panel with the intention of causing a disproportion on the grand jury that indicted the Petitioner. Here, the Mexican-Americans are a *governing* majority, and it cannot be presumed they would purposefully and intentionally discriminate against themselves.

It is true that the Texas selection system is archaic and inefficient in a day that calls for well-oiled judicial machinery. Its potential for abuse is great and it should be replaced by a more expedient process, but it has been upheld by the Supreme Court against repeated Constitutional attack, so its demise must depend upon legislative wisdom and not judicial decree.

By Order of Dismissal entered this date, Petitioner Rodrigo Partida's Petition for Writ of Habeas Corpus will be denied and this cause dismissed.